IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SOUTHERN UTAH WILDERNESS ALLIANCE, NATURAL RESOURCES DEFENSE COUCIL, and THE WILDERNESS SOCIETY,<br><br>       Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, UNITED STATES BUREAU OF LAND MANAGEMENT, and AHMED MOHSEN, in his official capacity as Price Field Office Manager,<br><br>      Defendants,<br><br>and<br><br>XTO ENERGY, INC.<br><br>      Intervenor-Defendant. | **MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR REVIEW OF AGENCY ACTION, AFFIRMING AGENCY ACTION IN PART, AND DISMISSING CERTAIN CLAIMS AS MOOT**<br><br>Case No. 2:15-cv-00194-JNP-EJF<br><br>District Judge Jill N. Parrish |

Before the court is a Motion for Review of Agency Action (Docket No. 62) filed by Plaintiffs Southern Utah Wilderness Alliance, Natural Resources Defense Council, and The Wilderness Society (collectively "Plaintiffs"). Plaintiffs challenge the United States Bureau of Land Management's ("BLM") decision to issue four oil and gas lease parcels in the November 2011 Oil and Gas Lease Sale ("2011 Lease Sale"), and its subsequent decision to approve the Horse Bench NE 24 Pad Seven-Well Project ("Seven-Well Project" or the "Project"). Plaintiffs' suit names the United States Department of the Interior, BLM, and the Price Field Office Manager for BLM, Ahmed Mohsen, (collectively "BLM") as defendants. XTO Energy, Inc. ("XTO Energy"), which purchased the leases and submitted the proposal for the Seven-Wells

Project, intervened as a defendant. As explained below, the court affirms the agency's action regarding the 2011 Lease Sale and dismisses Plaintiffs' claims regarding the Seven-Well Project as moot.

## I.      STATUTORY FRAMEWORK

Plaintiffs assert that BLM's actions violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321, *et seq.*, and the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. § 1701, *et seq.* Consequently, before addressing the substance of Plaintiffs' claims, the court outlines the statutory framework of NEPA and FLPMA below.

### A.  NEPA

Before an agency may take any "major Federal action[] significantly affecting the quality of the human environment," NEPA requires a thorough evaluation of potential environmental impacts. *See* 42 U.S.C. § 4332(2)(C); *Utah Envtl. Congress v. Russell*, 518 F.3d 817, 820 (10th Cir. 2008). "NEPA dictates the process by which federal agencies must examine environmental impacts, but does not impose substantive limits on agency conduct." *Russell*, 518 F.3d at 821 (citing *Fuel Safe Wash. v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1323 (10th Cir. 2004)). Thus, NEPA's primary mandates are keyed to the agency decisionmaking process itself, rather than the substantive outcome of that process:

> First, NEPA forces government agencies to 'consider every significant aspect of the environmental impact of a proposed action.' Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts.

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1021–22 (10th Cir. 2002) (internal citations omitted) (quoting and citing *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97, 103 S.Ct. 2246 (1983)). Thus, NEPA "requires federal agencies to pause before committing resources to a project and consider the likely environmental impacts of

the preferred course of action as well as reasonable alternatives." *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 703 (10th Cir. 2009) (citing 42 U.S.C. § 4331(b)).

In this pre-project "pause," an agency must first determine whether a proposed project will in fact "significantly affect[] the quality of the human environment" and therefore require further in-depth environmental impact analysis under § 4332(2)(C). Where the extent of environmental impact is initially unclear, an agency must prepare an initial environmental assessment ("EA"). *See* 40 C.F.R. § 1501.4 (b); *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006). The EA is "a concise public document that briefly provides sufficient evidence and analysis for determining the appropriate next step." *W. Watersheds Project v. Bureau of Land Mgmt.*, 721 F.3d 1264, 1269 (10th Cir. 2013) (internal quotations omitted) (quoting *Russell*, 518 F.3d at 821).

> If the agency finds that the action will not significantly affect the human environment (and is thus not a major action), it makes a "Finding of No Significant Impact" (or "FONSI"). If it finds the action will significantly affect the environment, it is then required to prepare a more extensive analysis in the form of an 'environmental impact statement' (or 'EIS').

*Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1207 (10th Cir. 2002) (citing *Airport Neighbors All. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996)).

Relevant here, any EIS or EA must "incorporate a range of reasonable alternatives, but the *depth* of discussion and analysis required is different depending on whether the document is an EIS or an EA." *W. Watersheds Proj.*, 721 F.3d at 1274 (emphasis in original). For instance, an EIS must present alternatives to the proposal so as to "provid[e] a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R § 1502.14. Accordingly, an EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives," "briefly" explain any alternatives eliminated from consideration, "[d]evote substantial treatment to each alternative

considered in detail[,]" "include reasonable alternatives not within the jurisdiction of the agency[,]" address the "alternative of no action[,]" and, *inter alia*, discuss "appropriate mitigation measures not already included in the proposed action or alternatives." § 1502.14(a)– (f). By contrast, an EA is a "concise public document" that must include, *inter alia*, only "brief discussions . . . of the environmental impacts of the proposed action and alternatives" to the proposal. § 1508.9(a)–(b).

As NEPA does not provide a private cause of action to redress Plaintiffs' grievances, they challenge BLM's actions under the Administrative Procedure Act ("APA"). *See Utah v. Babbitt*, 137 F.3d 1193, 1203 (10th Cir. 1998); *S. Utah Wilderness All. v. U.S. Dep't of Interior*, No. 2:13-cv-01060-EJF, 2016 WL 6909036, at *3 (D. Utah Oct. 3, 2016) (unpublished). Under the APA, a district court may only "hold unlawful and set aside agency action, findings, and conclusions" if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). In evaluating agency action, "[a] presumption of validity attaches to the . . . action and the burden of proof rests with" the challenging party to rebut that presumption. *Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010) (internal quotations omitted). Here, Plaintiffs must demonstrate that the errors they have alleged "compromised the EA so severely as to render the FONSI arbitrary and capricious." *W. Watersheds Project*, 721 F.3d at 1275. The FONSI may be considered arbitrary and capricious only if the BLM

> (1) [e]ntirely failed to consider an important aspect of the problem, (2) offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise, (3) failed to base its decision on consideration of the relevant factors, or (4) made a clear error of judgment.

*N.M. ex rel. Richardson*, 565 F.3d at 704 (internal quotations omitted).

### B.  FLPMA

FLPMA "creates a 'versatile framework' for governing . . . BLM's management of [public]

lands." *Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1128 (10th Cir. 2006) (quoting

*Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 737–38 (10th Cir. 1982)). The Act

provides for management of public lands "under principles of multiple use and sustained yield."

43 U.S.C. § 1732(a). As the Supreme Court observed:

> "Multiple use management" is a deceptively simple term that describes the
> enormously complicated task of striking a balance among the many competing
> uses to which land can be put, "including, but not limited to, recreation, range,
> timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic,
> scientific and historical values."

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58, 124 S.Ct. 2373 (2004) (alterations in

original) (quoting § 1702(c)). To balance these competing uses and achieve "sustained yield," §

1732(a), "FLPMA contains comprehensive inventorying and land use planning provisions" that

ultimately "ensure that the 'proper multiple use mix of retained public lands' [is] achieved."

*Rocky Mountain*, 696 F.2d at 739; *Norton*, 542 U.S. at 58 (explaining that FLPMA mandates "a

dual regime of inventory and planning").

These provisions specifically require the BLM to "develop, maintain, and, when appropriate,

revise land use plans" to guide and control its management of public lands. *See* 43 U.S.C. §

1712(a). "These land use plans, which the BLM regulations denote 'resource management plans'

('RMPs') . . . project both the present and future use of the land." *Utah Shared Access*, 463 F.3d

at 1129 (internal citations omitted) (citing 43 C.F.R. § 1601.0–5(n) and 43 U.S.C. § 1701(a)(2)).

"Generally, a land use plan describes, for a particular area, allowable uses, goals for future

condition of the land, and specific next steps." *Norton*, 542 U.S. at 59; 43 C.F.R. § 1601.0-5

(listing components of RMPs as "goals; objectives; designations; resource use determinations;

monitoring and evaluation standards; and lands identified as available for disposal, including sales"). Importantly, "FLPMA prohibits . . . BLM from taking actions inconsistent with the provisions of RMPs." *Utah Shared Access*, 463 F.3d at 1129 (citing *Norton*, 542 U.S. at 69; 43 U.S.C. § 1732(a); 43 C.F.R. § 1610.5-3). Nevertheless, an RMP may be amended after preparation of an EA or an EIS and submission of the proposed amendment to public notice and comment. *Id.* (citing 43 C.F.R. §§ 1610.5–5, 1610.2).

Important to this case, FLPMA governs oil and gas leasing on federally managed lands through a three-step process. First, as explained above, FLPMA directs BLM to "develop maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands," 43 U.S.C. § 1712(a), and may allocate public lands for oil and gas leasing, *see* 43 C.F.R. § 3120.1-1. Second, in accordance with the approved RMP, BLM nominates specific parcels for leasing under 43 U.S.C. § 1712(e) and the lease is sold at competitive auction. *See* 43 C.F.R. § 3120.3, 3120.5. Finally, the lessee submits an application for permit to drill (or "APD") to BLM, and, upon BLM's approval, the lessee may explore and extract on the leased parcel. *See* § 3162.3-1(c).

Like NEPA, FLPMA provides no private right of action, and any claims regarding an agency's compliance with the statute must be pursued through the APA. *Babbitt*, 137 F.3d at 1203; *see also* 5 U.S.C. § 702. Accordingly, the standard of review described above relating to NEPA is equally applicable to claims alleging violations of FLPMA. *See Utah Shared Access*, 463 F.3d at 1134 (applying the APA's "arbitrary and capricious" standard to claims alleging violations of FLPMA).

With this statutory framework in mind, the court now turns to the factual background underpinning Plaintiffs' claims.

## II.  FACTUAL BACKGROUND

Plaintiffs challenge BLM's decisions to lease four parcels of land and eventually approve one of those parcels for natural gas development. The parcels at issue span nearly 3,983 acres of the West Tavaputs Plateau above the confluence of the Green River and Nine Mile Creek, not far from Utah's eastern border with Colorado. In leasing these parcels, BLM acted under the Price Field Office Resource Management Plan ("PFO ROD/RMP"), approved in 2008.

The PFO ROD/RMP, along with its underlying Environmental Impact Statement ("EIS"), addressed, *inter alia*, whether and where to allow oil and gas development within the Price Field Office's management area. (*See, e.g.*, AR006764–AR006768). During the development of the PFO ROD/RMP, BLM prepared a supplemental EIS to evaluate an alternative ("Alternative E") that would protect non-wilderness ("non-WSA") lands with wilderness characteristics, including the four parcels at issue in this lawsuit. Finding Alternative E to be overly restrictive of other resource uses, BLM chose instead to manage 97,100 acres to protect their wilderness characteristics and expressly decided that other designated areas would prioritize oil and gas development over the protection of wilderness characteristics. (AR006676–AR006677).

In December 2008, shortly after the PFO ROD/RMP was issued, BLM held a competitive oil and gas lease sale and offered 116 parcels for lease. After protest and an agency review process, the Secretary of the Interior suspended seventy-seven of these leases, including leases covering the parcels at issue in this case. At the request of the Secretary, an interdisciplinary team prepared a report on the lands subject to the suspended leases (the "Stiles Report"). That report recommended that certain parcels be deferred from leasing until certain procedural requirements were met, including additional environmental impacts analysis.

Accordingly, BLM prepared the West Tavaputs Natural Gas Full Field Development Plan EIS ("WTP EIS"). The WTP EIS evaluated the development of 807 natural gas wells from 538 well pads across a geographic area encompassing the four lease parcels at issue in this case. (AR003391, AR003417). In addition to the proposed development, the WTP EIS considered the impact of five development alternatives. One of these alternatives, Alternative D, considered implementing various measures, including no-surface-occupancy ("NSO") stipulations,[1] to protect non-WSA lands with wilderness characteristics. (AR006086). In July 2010, BLM identified its selected alternative in a Record of Decision. (AR006096). The selected alternative considered impacts to non-WSA lands with wilderness characteristics and required imposition of certain protective lease stipulations on each lease sold in the area analyzed by the WTP EIS, including the leases at issue in this case. (AR006120–AR006121).

After issuing the WTP EIS Record of Decision, BLM prepared an environmental assessment ("EA") to analyze the environmental impacts of offering nine oil and gas leases for sale, including the four at issue in this case. The EA analyzed the impacts of oil and gas leasing on numerous resources such as: cultural sites, protected animal and plant species, hydrologic conditions, non-WSA lands with wilderness characteristics, and air quality. (AR000540–AR000568). The EA considered two alternatives: (1) the proposed action, which permitted the leases with certain protective stipulations in accordance with the PFO ROD/RMP and the WTP EIS, and (2) a no-action alternative, which precluded any leasing. (AR000553–AR000568).

The draft EA was presented for public comment in mid-2011. Plaintiffs responded, objecting in particular to the draft EA's treatment of non-WSA lands with wilderness

---

[1] In the PFO ROD/RMP, an NSO is defined as "[a] fluid minerals leasing constraint that prohibits occupancy or disturbance on all or part of the lease surface to protect special values or uses. Lessees may exploit the fluid mineral resources under the leases restricted by this constraint through use of directional drilling from sites outside the area." (AR006803).

characteristics. Plaintiffs argued that the draft EA should consider "a leasing alternative that fully protects lands with wilderness characteristics, either through parcel deferrals or NSO stipulations." (AR000635). BLM responded to Plaintiffs' objections, declining to conduct further analysis of Plaintiffs' proposed alternatives. After the close of the public comment period and some tweaking of the draft EA, BLM issued the final EA in August 2011. BLM subsequently issued a Finding of No Significant Impact ("FONSI") authorizing the issuance of the leases without further analysis. (AR000505–AR000523). Based on the FONSI, BLM approved the parcels at issue for lease. BLM sold the leases at a public auction in November 2011, and issued them to XTO Energy shortly thereafter.

XTO Energy soon submitted seven APDs for seven wells on the leases and requested permission to construct pipeline and road infrastructure to service the wells. This project proposal was known as the Horse Bench NE 24 Pad Seven-Well Project ("Seven-Well Project" or the "Project"). In evaluating the applications for permits, BLM determined that existing NEPA documents adequately addressed the potential environmental impacts of the proposed project and authorized the permits and associated rights of way. (AR001596–AR001610).

In March of 2015, Plaintiffs filed their original Complaint against BLM. (Docket No. 2). Thereafter, Plaintiffs' filed a First and Second Amended Complaint. (Docket Nos. 4, 47). During the same period, XTO Energy filed a motion to intervene, which was granted by the court. (Docket Nos. 11, 19). BLM filed an Answer to the Second Amended Complaint on April 29, 2016. (Docket No. 48). XTO Energy filed an Answer on May 2, 2016. (Docket No. 49). The administrative record was filed with the court on June 3, 2016, and supplemented on July 1, 2016. (Docket Nos. 53, 59). Plaintiffs thereafter filed the instant Motion on August 22, 2016. (Docket No. 62). BLM and XTO Energy each filed their responses to the Motion on November

10, 2016. (Docket Nos. 70, 71). On December 16, 2016, Plaintiffs filed their reply brief. (Docket No. 75). Oral argument was held before the court on March 14, 2017.

On November 9, 2016, one day before submitting its response brief in this matter, BLM amended its previous approval of XTO Energy's APDs, indefinitely suspending each APD and associated rights of way. (Docket No. 71-1). The amendment provides that, after additional NEPA-compliant review of site-specific environmental impacts, BLM will issue a decision covering each suspended APD that will lift the suspension without modifying the conditions of approval, lift the suspension with modified conditions of approval, or rescind the approval entirely. (*Id.*). The effect of this amendment on the litigation will be discussed below.

The court now decides Plaintiffs' Motion under jurisdiction granted by 28 U.S.C. §§ 1331, 2201, 2202, and 5 U.S.C. §§ 701–706.

## DISCUSSION

The operative Complaint challenges two related BLM actions: First, the issuance of four oil and gas leases offered for sale on November 15, 2011 and, second, the subsequent approval of applications for permits to "drill seven natural gas wells and construct related infrastructure on one of th[e] four challenged leases." (Docket No. 47 at 2). In this Motion, Plaintiffs argue that the 2011 Lease Sale violated NEPA because BLM failed to consider the leasing alternatives Plaintiffs proposed during the public comment period. As to the Seven-Well Project, Plaintiffs argue that BLM violated NEPA's "hard look" requirement by failing to examine the site-specific environmental impacts of the Project. Further, Plaintiffs argue that BLM violated FLPMA by approving the Seven-Well Project without certain air quality stipulations that are allegedly required by the PFO ROD/RMP. The court will first address the claim arising from the 2011 Lease Sale, and then turn to the claims related to the Seven-Well Project.

I.      THE 2011 OIL AND GAS LEASES

Plaintiffs first claim that BLM violated NEPA by failing to analyze two reasonable alternatives proffered by Plaintiffs during the drafting of the EA for the 2011 Lease Sale. In evaluating this argument, the court is mindful that "[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the [parties'] position and contentions, in order to allow the agency to give the issue meaningful consideration" and thereby avoid waiver. *See Silverton Snowmobile Club*, 433 F.3d at 783 (internal quotations omitted) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764, 124 S.Ct. 2204 (2004)). Further, in evaluating BLM's actions, the court is to "consider only the agency's reasoning at the time of decisionmaking, excluding post-hoc rationalization concocted by counsel in briefs and argument." *See N.M. ex rel. Richardson*, 565 F.3d at 704. Thus, in order to properly assess Plaintiffs' challenge, it is critical to examine what Plaintiffs actually presented to the agency as well as BLM's actual response during the EA drafting process.

BLM presented the draft EA for the 2011 Lease Sale for public comment in mid-2011. Plaintiffs objected during the public comment period, referencing internal policy memos from the Department of the Interior, and arguing that these memos precluded any offer of the leases or at least required BLM to "'consider' wilderness characteristics 'when making project-level' decisions." (AR000634). Because the parcels had already been inventoried and found to have wilderness characteristics, Plaintiffs insisted that BLM must "now fully 'consider' those characteristics while planning for the . . . lease" of the parcels by "develop[ing] and evaluat[ing] a leasing alternative that fully protects lands with wilderness characteristics, either through parcel deferrals or NSO stipulations." (AR000634–AR000635). Thus, Plaintiffs suggested two distinct alternatives to the draft EA's alternatives: First, that some or all of the leases be deferred,

and, second, that the leases be issued with restrictive NSO stipulations. To illustrate the first alternative, Plaintiffs cited to the Colorado BLM's deferral of similar parcels "in order to update its wilderness inventory and protect 'primitive recreation opportunities.'" (AR000635). Plaintiffs explained that deferral of the leases or the addition of NSO stipulations thereto would serve to "protect wilderness characteristics" consistent with previous lease sale EAs and internal BLM procedure. (*Id.*).

BLM responded that it had specifically analyzed the impact of the leases on non-WSA lands with wilderness characteristics within the EA. (AR000635). BLM further asserted that it had "fully considered and documented the extent to which the value and use of lands with wilderness characteristics would be foregone" in the 2008 PFO ROD/RMP, which had determined that geographical areas that included the parcels at issue would not be managed to preserve wilderness characteristics. (AR000634; *see also* AR001278). BLM further explained that the PFO ROD/RMP had "fully considered" managing 937,440 acres of land, including the parcels at issue, "to protect, preserve, and maintain their wilderness characteristics" as an alternative ("Alternative E") that was ultimately rejected in favor of the adopted RMP. (AR000635). This rejected alternative considered, *inter alia*, the application of NSO stipulations to large sections of PFO-managed land.[2] (*See id.*). BLM concluded that its decision to offer the leases at issue was in accordance with the inventories in the 2008 PFO ROD/RMP and the 2010 WTP EIS, as well as decisions regarding land-use contained in the 2008 PFO ROD/RMP. (AR000636). And, importantly, BLM could not identify "any change in circumstance to warrant the need to revisit th[e] decisions made in the PFO ROD/RMP" in this instance. (*Id.*). As for

---

[2] While the adopted RMP did not require NSO stipulations for mineral leases in most of the area including the parcels at issue, it did require that certain less restrictive constraints (drawn from the PFO ROD/RMP and WTP EIS) be incorporated into all mineral leases issued "when determined to be necessary from the NEPA review conducted for the [leasing] action." (AR001277).

Plaintiffs' suggestion of a deferral alternative, BLM acknowledged that the Colorado State Office BLM had deferred similar leases, but explained that those leases were deferred "while [Colorado BLM officials] compile and analyze [the] level of inventory information that Utah BLM already has through the 2008 PFO proposed RMP/Final EIS." (AR000635).

In essence, BLM rejected Plaintiffs' proffered alternatives because it considered the information and decisions in the previous RMP (and more recent EIS) sufficient to address the alternatives Plaintiffs had raised. Plaintiffs reject this reasoning. They suggest instead that BLM could not base its rejection of the proffered alternatives on previous land-use analyses that differed significantly from the site-specific EA in size, scope, and purpose. Thus, Plaintiffs argue that, in rejecting the proposed alternatives, BLM failed to consider a reasonable range of alternatives as required by NEPA. In response, BLM contends that it properly rejected Plaintiffs' proffered alternatives because the alternatives were ultimately infeasible and because sufficiently similar alternatives had already been considered in studies incorporated by reference into the EA. Thus, BLM asserts that the EA's range of alternatives satisfied the statutory and regulatory requirements of NEPA. As explained below, the court finds that BLM's stated rationale for rejecting Plaintiffs' proffered alternatives was neither arbitrary nor capricious, and therefore Plaintiffs' challenge to the sufficiency of alternatives considered by BLM fails.

NEPA requires BLM to "incorporate a range of reasonable alternatives" into any EA prepared for a proposed project. *W. Watersheds Project*, 721 F.3d at 1274; *see also* 40 C.F.R. § 1508.9(b) (requiring EAs to include "brief discussions of . . . the environmental impacts of the proposed action and alternatives"). In order "to determine whether an agency acted arbitrarily or capriciously by not considering certain alternatives, a 'rule of reason and practicality' informs the analysis." *Biodiveristy Conservation All. v. Jiron*, 762 F.3d 1036, 1083 (10th Cir. 2014)

(quoting *Airport Neighbors All.*, 90 F.3d at 432)). Under this "rule of reason," "[a]lternatives that

do not accomplish the purpose of an action are not reasonable and need not be studied in detail

by the agency." *Citizens' Comm.*, 297 F.3d at 1031 (citation and quotations omitted).  Likewise,

"[a]n agency need not analyze the environmental consequences of alternatives it has in good

faith rejected as too remote, speculative, . . . impractical or ineffective." *Airport Neighbors All.*,

90 F.3d at 432 (alterations in original) (quoting *City of Aurora v. Hunt*, 749 F.2d 1457, 1467

(10th Cir. 1984)). Moreover, NEPA does not require an agency to conduct a "separate analysis of

alternatives which are not significantly distinguishable from alternatives actually considered, or

which have substantially similar consequences." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914

F.2d 1174, 1181 (9th Cir. 1990); *see also N. M. ex rel. Richardson*, 565 F.3d at 711 ("[A]gencies

are excused from analyzing alternatives that are not 'significantly distinguishable' from those

already analyzed.").

       Here, Plaintiffs argue that BLM violated the "rule of reason" by rejecting their proffered

deferral and NSO alternatives in reliance on information and land-use determinations contained

in the previously compiled 2008 PFO ROD/RMP and 2010 WTP EIS. The court will apply the

"rule of reason" first to Plaintiffs' deferral alternative and then to their NSO alternative.

### A.  BLM properly rejected the deferral alternative proffered by Plaintiffs.

       Plaintiffs first challenge BLM's rejection of their proffered deferral alternative. Plaintiffs

did not provide significant explanation regarding the contours or ultimate purpose of parcel

deferrals in their objection to the draft EA, but they seemed to argue that deferrals could be

justified by the need to gather relevant wilderness inventory information.[3] This is implied by

---

[3] The vagueness of this objection hews dangerously close to a waiver for lack of specificity. As explained above, a party "challenging an agency's compliance with NEPA must structure [its] participation" so as to "alert the agency" to the party's position and allow the agency to give the challenge meaningful consideration. *Silverton Snowmobile*

Plaintiffs' choice to favorably highlight the Colorado BLM's deferral of certain parcels "in order to update its wilderness inventory and protect 'primitive recreation opportunities.'" (AR000635).

BLM directly addressed this proposed alternative by explaining that Colorado BLM officials had chosen to defer leasing certain parcels in order to "compile and analyze [the] level of inventory information that Utah BLM *already has* through the [PFO ROD/RMP]." (*Id.* (emphasis added)). Thus, BLM concluded that there was sufficient information to proceed with lease decisions and that deferral to gain additional inventory information was therefore unnecessary. The court does not find this conclusion either arbitrary or capricious. Plaintiffs have provided no evidence that the extensive inventory information BLM had on hand from previous studies was inadequate for purposes of the leasing decisions at issue. Moreover, BLM staff visited the individual parcels at issue in order to "validate existing data and gather new information in order to make an informed leasing recommendation" prior to compiling the EA. (AR000535). Thus, BLM had at least general information regarding the parcels from previous studies and both confirmed and supplemented that information with individual site visits. On this record, BLM had sufficient information to proceed with leasing decisions; any alternative that required the agency to stop leasing simply to obtain information that it already had on hand would be needlessly redundant and ultimately unreasonable. *See Custer Cty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1041 (10th Cir. 2001) ("[NEPA] requires only that *reasonable* alternatives be evaluated." (emphasis added)); *Airport Neighbors All.*, 90 F.3d at 432 (allowing agencies to reject proposed alternatives that are either "impractical or ineffective"). "There will always be more data that could be gathered; agencies must have some discretion to decide when to draw the line and move forward with decisionmaking." *See Town of Winthrop v. FAA*, 535

---

*Club*, 433 F.3d at 783. Nevertheless, as BLM seemed to understand Plaintiffs' objection well enough to respond, the court will consider it.

F.3d 1, 11 (1st Cir. 2008). Plaintiffs have not demonstrated that BLM abused that discretion here.

Accordingly, BLM properly rejected the proposed deferral alternative.[4]

### B.  BLM properly rejected the NSO alternative proffered by Plaintiffs.

Plaintiffs next challenge BLM's rejection of their proposed NSO alternative, which

would have considered attaching restrictive NSO stipulations to parcel leases in order to limit

deleterious effects on wilderness characteristics. Plaintiffs insist that an "unresolved conflict[]"

concerning alternative uses of available resources" (i.e., a conflict between mineral development

and wilderness characteristics) characterized the parcels at issue, requiring BLM to "study,

develop, and describe appropriate alternatives" to the proposed leases. *See* 42 U.S.C. §

4332(2)(E); 40 C.F.R. 1508.9(b) (requiring an EA to include brief discussion of alternatives

required by 42 U.S.C. § 4332(2)(E)). As explained above, BLM concluded that it need not

conduct further analysis of possible NSO stipulations in light of the land-use decisions in the

PFO ROD/RMP and that document's analysis of Alternative E, which explicitly considered and

rejected managing extensive areas (including the parcels at issue) to preserve wilderness

characteristics. Plaintiffs argue that BLM could not reject their NSO alternative based on land-

use decisions made in the 2008 PFO ROD/RMP because such broad-scale analysis differs

markedly in "purpose and need" from the site-specific EA at issue here: "While the analysis in

the [PFO ROD/RMP] gave BLM a basis for rejecting Alternative E at the land use planning

stage . . . , it offers no insight into site-specific resource conflicts *at the lease sale stage*, or how

---

[4] Insofar as Plaintiffs' deferral alternative suggests indefinite postponement of parcel leasing solely to protect wilderness characteristics, BLM properly rejected it. Deferral for deferral's sake is not "significantly distinguishable" from the no-action alternative already considered in the EA. *See N. M. ex rel. Richardson*, 565 F.3d at 711 ("[A]gencies are excused from analyzing alternatives that are not 'significantly distinguishable' from those already analyzed."); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1248–49 (9th Cir. 2005) ("[I]f Native Ecosystems wanted an alternative that did not involve [the consequences of the preferred alternative], it got one—the 'no action' alternative."). And BLM specifically cited to the no-action alternative's analysis of non-WSA lands with wilderness characteristics in rejecting Plaintiffs' proffered alternatives. (*See* AR00635).

BLM might resolve those conflicts through a leasing decision." (Docket No. 62, at 24 (emphasis in original)). This court disagrees and holds instead that the PFO ROD/RMP provided a reasonable basis for rejecting Plaintiffs' proposed NSO alternative.

While it is true, as Plaintiffs argue, that the PFO ROD/RMP did not include any decisions to lease specific parcels, *see* 43 C.F.R. § 1601.0-5 (explaining that an RMP "is not a final implementation decision on actions which require further specific plans, process steps, or decisions"); *Norton*, 542 U.S. at 69 ("[L]and use plans are not normally used to make site-specific implementation decisions."), the RMP did include crucial decisions about where and under what conditions leases would be issued. As explained by BLM during the EA drafting process, the PFO ROD/RMP determined that only certain areas would be managed to preserve their wilderness characteristics, (AR 006734), while others would be open for mineral development—even where such development would be detrimental to other identified resources, including wilderness characteristics, (*see* AR006767; AR006655).  Within the 97,100 acres specifically selected for management to preserve wilderness characteristics, areas were either entirely closed to oil and gas leasing or open to such leasing only with NSO lease stipulations that would prevent any surface-disturbing exploration or extraction. (AR006734). More than two million total acres were specifically designated as "open to leasing" subject to various levels of constraint, including relatively permissive standard leasing conditions, moderately restrictive lease notices, and, in some sensitive areas, highly restrictive NSOs. (AR006764–AR006767).

Important here, the Desolation Canyon Unit One, which encompasses the parcels at issue in this case, was not selected for management to preserve its wilderness characteristics. (*See* AR006676; AR000546). Instead, the area was among "seven non-WSA lands with wilderness characteristics areas not carried forward for protection [of wilderness characteristics]" due to

significant potential for energy and mineral development. (*See* AR006676, AR007250, AR000546). Moreover, the PFO RMP/ROD required that leases issued in the Desolation Canyon Unit One be subject to either NSO stipulations or lesser restrictions to protect various surface resources. (*See* AR007264). The parcels at issue fall within the geographic area that is subject to lesser protective lease stipulations. (*See id.*; *e.g.*, AR000582). Thus, the PFO ROD/RMP excluded the Desolation Canyon Unit One area (and, by extension, the parcels at issue) from designated areas specifically selected for management to preserve wilderness characteristics and other areas specifically selected for the application of NSO stipulations. Moreover, as BLM noted, the PFO ROD/RMP specifically rejected designating lands including the Desolation Canyon Unit One area for management to preserve wilderness characteristics when it rejected Alternative E. (*See* AR006654–AR006657).

Plaintiffs' proposed NSO alternative would have upended these land-use decisions in at least two ways. First, the alternative would have fundamentally recast parcels within the Desolation Canyon Unit One, prioritizing the protection of wilderness characteristics over the advancement of oil and gas leasing. Second, the alternative contemplated imposing highly-restrictive NSO stipulations outside of the specific geographic areas where such stipulations were required under the RMP. In response to Plaintiffs' objections to the draft EA, BLM explained that analysis of such an alternative was unnecessary because "[t]here has not been any change in circumstances to warrant the need to revisit th[e] decisions made in the PFO ROD/RMP." [5] (AR

---

[5] BLM's approach here was in accordance with its statutory mandate. FLPMA requires BLM to develop an RMP and to govern subsequent management decisions "in accordance with" that RMP. 43 U.S.C. §§ 1712(a), 1732(a). This statutory directive "prevent[s] BLM from taking actions inconsistent with the provisions of a land use plan." *Norton*, 542 U.S. at 69 (citations omitted); *see also* 43 C.F.R. § 1610.5-3(a) (requiring that "subsequent more detailed or specific planning . . . conform to" the adopted RMP). Thus, BLM actions inconsistent with an adopted RMP "can be set aside as contrary to law." *Id.* An RMP may only be revised "when appropriate" under FLPMA. 43 U.S.C. § 1712(a). Accordingly, the PFO ROD/RMP provides for changes to "leasing allocation[s] or specific lease stipulation[s] . . . through the plan maintenance or amendment process" only when "*new resource data information or circumstances relevant to the decision* [are] available at the time of the lease review" for individual parcels.

000636). In other words, there was no obvious reason to reevaluate the established designation of specified areas to protect wilderness characteristics and others to facilitate oil and gas leasing. Nor was there any reason to reconsider the Desolation Canyon Unit One area's designation as open to oil and gas leasing subject only to lesser constraints under the RMP. Plaintiffs cannot point to any changed circumstances that would necessitate such reevaluation and have failed to proffer any facts that would suggest that BLM's reasoning on this point was either arbitrary or capricious. Instead, Plaintiffs seem to suggest that NEPA requires BLM to reevaluate its land-use decisions at every level, with every project, even when there is no evidence that such reevaluation is necessary. Such an approach to the alternatives analysis is patently unreasonable and is not required by NEPA. *See WildEarth Guardians v. Nat'l Park Serv.*, 703 F.3d 1178, 1183 (10th Cir. 2013) ("[A]gencies need not consider every possible alternative to a proposed action, only 'reasonable' alternatives." (quoting 40 C.F.R. § 1502.14(a))); *cf. Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1156–57 (10th Cir. 2004) (holding that an agency decision was properly overturned where there was "substantial [record] evidence to support the . . . conclusion that the proposed action raised significant new environmental concerns that had not been addressed by existing NEPA documents"). Accordingly, BLM was not required to consider Plaintiffs' proposed NSO alternative. [6]

---

(AR006766 (emphasis added)). As explained below, Plaintiffs have not come forward with any "new resource data information or circumstances relevant to the decision" that would authorize, let alone necessitate, any alteration of the RMP's directives.

[6] Plaintiffs also suggest that BLM entirely failed to conduct required site-specific analysis by substituting previously completed analysis from the PFO ROD/RMP and WTP EIS. (Docket No. 62, at 25) ("The regulations do not allow an agency to *substitute* broad analysis for site-specific analysis, as BLM has done here." (emphasis in original)). If BLM had indeed relied *solely* on these previous analyses without any attention to site-specific issues—concluding without further elaboration that the proffered alternatives were unnecessary because the previous analyses were sufficient in and of themselves—such reasoning could be suspect. But this version of events is not reflected in the record. Instead, BLM explained that there had "*not been any change in circumstances* to warrant the need to revisit those decisions [regarding wilderness characteristics and NOS stipulations] made in the PFO ROD/RMP." (AR000636 (emphasis added)). This conclusion was no doubt informed by the interdisciplinary parcel review

Moreover, even if BLM were required to consider the NSO alternative, the "brief discussion[]" of the alternative offered in response to Plaintiffs' objection and appended to the final EA would suffice for purposes of compliance with NEPA. *See* 40 C.F.R. § 1508.9(b) (requiring only "brief discussion[]" of alternatives to the proposed project in an EA); *W. Watersheds Project*, 721 F.3d at 1274 (explaining that the "depth of discussion and analysis required [by NEPA] is different depending on whether the document is an EIS or an EA" and indicating that an EA requires less detailed discussion and analysis (emphasis omitted)); *S. Utah Wilderness All.*, 2016 WL 6909036, at *13 (holding that evaluation of proposed alternative in agency's response to public comment sufficed as "brief discussion" under regulatory requirements for an EA).

### C.  Plaintiffs have failed to demonstrate prejudice resulting from the alleged errors.

Finally, even if BLM's rejection of the proffered alternatives were erroneous, Plaintiffs have failed to demonstrate that the rejection itself or the lack of more substantial analysis of these alternatives "compromised the EA so severely as to render the FONSI arbitrary and capricious." *W. Watersheds Project*, 721 F.3d at 1275. Errors that amount to "mere 'flyspecks' and do not defeat NEPA's goals of informed decisionmaking and informed public comment will not lead to reversal." *See N.M. ex rel. Richardson*, 565 F.3d at 704. "And even if an agency violates the APA, this does not require reversal unless the [plaintiff] demonstrates prejudice

---

(IDPR) team's site visits to the parcels at issue in May of 2011, which were conducted "to validate existing data and gather new information in order to make an informed leasing recommendation." (AR000535). Thus, BLM evaluated the parcels at issue, referred to the previous analyses of the area included in the PFO ROD/RMP as well as the more recent WTP EIS, and concluded that there was no present reason to revisit the decisions made in past analyses regarding the general protection of wilderness characteristics or the specific imposition of NOS stipulations. That same process informed the FONSI, which concluded that the EA's analysis of site-specific information indicated that "there are no new circumstances or information that would substantially change the analysis [found in the WTP EIS]." (AR000506). This is not unthinking or inappropriate reliance on previous analyses, but a synthesis of site-specific information with previously completed analyses that yields an entirely new analysis. Accordingly, the court rejects Plaintiffs' allegation that BLM failed to conduct appropriate site-specific analysis regarding the parcels at issue.

resulting from the error." *See WildEarth Guardians*, 703 F.3d at 1183. Plaintiffs have not alleged

prejudice beyond the rejection itself and have not shown how the alleged errors so compromised

BLM's analysis as to render the issuance of the leases arbitrary and capricious.[7] Moreover,

Plaintiffs have not demonstrated that additional analysis of their proposed alternatives would

have altered BLM's overall analysis or ultimate decision regarding the leases. *See Prairie Band*

*of Pottawatomie Nation v. Fed. Highway Admin.*, 684 F.3d 1002, 1008–10  (10th Cir. 2012)

(discussing the application of harmless error in the context of NEPA compliance); *W.*

*Watersheds Project*, 721 F.3d at 1275 ("Under our highly deferential review, we cannot set aside

the agency's decision merely because the EA could have been more thorough than it was.").

        In reality, BLM's alternatives analysis—even limited as it was to consideration of the

proposed action and a no-action alternative—was likely sufficient to make an informed decision

regarding issuance of the leases. *See Native Ecosystems*, 428 F.3d at 1246 (explaining that NEPA

"does not impose a numerical floor on alternatives to be considered" and upholding decision of

agency to consider only the proposed action and a no-action alternative); *Citizens for Smart*

*Growth v. Sec'y of Dep't of Trasp.*, 669 F.3d 1203, 1212 (11th Cir. 2012) ("NEPA does not not

impose any minimum number of alternatives that must be evaluated."). The contrast between the

proposed action and no-action alternative likely allowed BLM to adequately gauge the

---

[7] At oral argument, Plaintiffs seemed to suggest that they were solely challenging the sufficiency of the alternatives analysis and not the FONSI. But the alternatives analysis is not a free-floating requirement divorced from the broader purposes of NEPA analysis—it is an aspect of the "hard look" that agencies must take to comply with NEPA and is inextricably tied to the resulting agency decision, i.e., the FONSI. *See N.M. ex rel. Richardson*, 565 F.3d at 709 ("We apply the 'rule of reason' to determine whether an EIS analyzed sufficient alternatives to allow BLM to take a hard look at the available options."); *W. Watersheds Project*, 721 F.3d at 1274 (analyzing an EA's analysis of alternatives to determine whether it "rendered the FONSI arbitrary and capricious"). When determining the sufficiency of an EA's alternatives analysis, a court "cannot set aside the agency's decision merely because the EA could have been more thorough than it was." *W. Watersheds Project*, 721 F.3d at 1275. Instead, the party challenging the sufficiency of an alternatives analysis must show that the procedural failure was somehow substantively prejudicial. *See WildEarth Guardians*, 703 F.3d at 1183; *W. Watersheds Project*, 721 F.3d at 1275. In other words, for Plaintiffs' argument to have any teeth, it must be that BLM failed to take a "hard look" at environmental impacts by unjustifiably failing to consider their proffered alternatives. But, as explained above, BLM properly rejected Plaintiffs' proffered alternatives and Plaintiffs have failed to demonstrate that the EA was anything less than a "hard look."

environmental impacts of issuing leases and allowing development on the parcels at issue. In any event, Plaintiffs have failed to demonstrate otherwise and have therefore failed to overcome the presumption of validity that attaches to BLM's analysis and resulting decision. *See Morris*, 598 F.3d at 691 (explaining the presumption of validity and assigning the burden of proof to those challenging the agency action).

In sum, the court rejects Plaintiffs' arguments alleging the insufficiency of the 2011 Lease Sale EA and affirms BLM's decision arising therefrom.

## II.       THE SEVEN-WELLS PROJECT

Plaintiffs next challenge BLM's approval of Applications for Permits to Drill ("APDs") requested by Intervenor-Defendant XTO Energy as part of the Seven-Wells Project (the "Project"). Plaintiffs first claim that BLM failed to take a "hard look" at the site-specific environmental impacts of the Project before issuing the APDs. Plaintiffs also claim that the issuance of APDs without additional air quality restrictions violated the PFO ROD/RMP and therefore violated FLPMA.

Before addressing these remaining claims, the court must address two challenges to the court's subject matter jurisdiction raised by BLM. BLM first argues that Plaintiffs' claims under FLPMA are time-barred by statute, vitiating any statutory waiver of sovereign immunity and eliminating this court's subject matter jurisdiction. BLM next argues that, regardless of timeliness, all claims regarding the Project are moot after an indefinite suspension of the underlying APDs. The court will address these arguments in turn.

### A.  **BLM's sovereign immunity challenge fails and, as a result, the court has subject matter jurisdiction insofar as the claims are not moot.**

BLM first urges that Plaintiffs' claim under FLPMA is nothing more than a "backdoor challenge to the terms of the . . . leases" at issue, (Docket No. 71, at 32), and is therefore barred

by the Mineral Lands Leasing Act's ("MLLA") requirement that any "action contesting a decision of the Secretary involving any oil and gas lease" be commenced within ninety days of a final agency decision, *see* 30 U.S.C. § 226-2. Because Plaintiffs did not file their action within the prescribed ninety-day period, BLM reasons that the waiver of sovereign immunity contemplated in MLLA is no longer effectual and, as a result, this court lacks subject matter jurisdiction over the claim. (Docket No. 71, at 32). Plaintiffs counter that the MLLA limitations period is inapplicable because their claim is brought under the APA and alleges violations of FLPMA, not MLLA. As explained below, the court agrees with Plaintiffs.

MLLA's ninety-day limitations period applies only to actions "alleging failure to comply with [MLLA]" and not to actions alleging failure to comply with other statutes—even if those actions directly involve oil and gas leases. *See Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1142 (D. Mont. 2004) (citing *Park Cty. Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609 (10th Cir. 1987), *overruled on other grounds*, *Villa. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992)); *Aulston v. United States*, 915 F.2d 584, 588 n.4 (10th Cir. 1990) (applying the reasoning of *Park Cty. Res. Council* to an FLPMA claim regarding mineral leases). Thus, whether or not Plaintiffs' claim is in fact a "backdoor challenge" to the terms of the leases is irrelevant—the claim will not be judged against the terms of the MLLA, but against the terms of FLPMA. Therefore, Plaintiffs' claim is not subject to the ninety-day limitations period mandated by MLLA. *See Aulston*, 915 F.2d at 588 n.4 ("This [ninety-day] limitation does not apply to actions under . . . FLPMA, but rather to the validity of lease permits issued pursuant to [MLLA].").

Instead, Plaintiffs' claim is subject to the six-year limitations period mandated by the APA. *See* 28 U.S.C. § 2401(a); *Nagahi v. Immigration & Naturalization Serv.*, 219 F.3d 1166,

1171 (10th Cir. 2000) ("In the absence of a specific statutory limitations period, a civil action against the United States under the APA is subject to the six year limitations period found in 28 U.S.C. § 2401(a)."). Plaintiffs brought this action well within that six-year window and, accordingly, it is not time barred. As a result, the limited sovereign immunity waiver contemplated in the APA is operative here, *see* 5 U.S.C. §§ 702–04; *High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1181 (10th Cir. 2006), and the court may exercise subject matter jurisdiction over the claim.

### B. BLM's mootness challenge is successful, necessitating dismissal of the moot claims.

BLM next argues that all of Plaintiffs' claims regarding the issuance of APDs in conjunction with the Project are moot. Plaintiffs allege that BLM violated NEPA by failing to take a "hard look" at the site-specific environmental effects of the Project and violated the PFO ROD/RMP and FLPMA by approving the Project without sufficient pollution mitigation measures to ensure air quality. As the party suggesting that this controversy has been mooted by intervening events, BLM "bears the burden of coming forward with the subsequent events that have produced that alleged result." *Chihuahuan Grasslands All. v. Kempthorne*, 545 F.3d 884, 891 (10th Cir. 2008) (internal quotations omitted) (quoting *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 98, 113 S.Ct. 1967 (1993)).

To that end, BLM explains that it issued an amendment to its previous decision regarding the Project on November 9, 2016, suspending the grant of APDs and rights-of-way to XTO Energy "until the completion of an appropriate [NEPA] document analyzing, among other things, the site-specific impacts of the APDs." (Docket No. 71-1). BLM further indicated that, once the NEPA analysis was complete, "a new decision covering each suspended APD" will be issued. (*Id.*). Each new decision will "do one of the following[:] 1) lift the suspension without

modifying the conditions of approval specified in the prior approval of the APD . . . ; 2) lift the suspension with modified or new conditions of approval[;] or . . . 3) rescind the prior approval of the APD . . . ." (*Id.*).

   In response, Plaintiffs explicitly concede that the suspension of the Project has mooted their related claims under NEPA. Plaintiffs also seem to concede that their related claims for injunctive and declaratory relief under FLPMA are *technically* mooted by the suspension, but insist that the "voluntary-cessation" exception to the mootness doctrine applies to the claim for declaratory relief. As explained below, this court holds that all claims related to the Seven-Well Project and associated APDs are moot and the voluntary-cessation exception does not apply to Plaintiffs' FLPMA claim for declaratory relief.

   **1. Plaintiffs' claims regarding the Seven-Wells Project are moot.**

   In general, "a federal court cannot give opinions absent a live case or controversy before it," *In re Overland Park Fin. Corp.*, 236 F.3d 1246, 1254 (10th Cir. 2001) (citation and quotations omitted), because "the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction," *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005) (internal quotations omitted) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996)). Thus, "[m]ootness is a threshold issue," *see id.*, that must be decided before addressing the merits of Plaintiffs' request for declaratory judgment, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109–10 (10th Cir. 2010) ("Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit.").

   In evaluating whether a claim for declaratory judgment is moot, "[t]he crucial question is whether granting a present determination of the issues offered will have some effect in the real

world." *See id.* at 1110 (internal quotations and emphasis omitted) (quoting *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005)); *Overland Park*, 236 F.3d at 1254 ("A case is moot when it is impossible for the court to grant any effectual relief whatever to a prevailing party."); *Kennecott Utah Copper Corp. v. Becker*, 186 F.3d 1261, 1266 (10th Cir. 1999) ("The core question in a mootness inquiry is whether granting a present determination of the issues offered . . . will have some effect in the real world." (citation and quotations omitted)). A court must "look beyond the initial controversy which may have existed at one time and decide whether the facts alleged show that there is a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Chihuahuan Grasslands*, 545 F.3d at 891 (quoting *Beattie v. United States*, 949 F.2d 1092, 1094 (10th Cir. 1991)).

Here, the court concludes (and Plaintiffs appear to concede) that the suspension of the Project pending further environmental analysis has mooted Plaintiffs' claims regarding the Project. After further environmental impact analysis, each of the APDs challenged by Plaintiffs will be replaced by "a *new* decision covering each suspended APD" that may or may not allow for further development on the leased parcels and may or may not "contain modified or new conditions of approval." (Docket No. 71-1 (emphasis added)); *see also Rio Grande*, 601 F.3d at 1111–12 (holding that challenges to government agency's "biological opinion" were mooted by the issuance of a subsequent, superseding biological opinion); *Wyoming*, 414 F.3d at 1212 ("[T]he alleged procedural deficiencies of the [challenged rule] are now irrelevant because the replacement rule was promulgated in a new and separate rulemaking process."). As the original APDs are no longer operative, the alleged injury to Plaintiffs (i.e., the issuance of the original APDs without adequate environmental impacts analysis or air quality restrictions) has

evaporated. Further, it is entirely uncertain at this stage what form, if any, new APDs will take. In other words, there is now no "substantial controversy of sufficient immediacy and reality" regarding either the process that created the original APDs or their content. *See Chihuahuan Grasslands*, 545 F.3d at 891 (quoting *Beattie*, 949 F.2d at 1094); *S. Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) ("If an event occurs while a case is pending that heals the injury and only prospective relief has been sought, the case must be dismissed."). Accordingly, the court holds that each of Plaintiffs' claims regarding the Project under NEPA and FLPMA are moot.

### 2. The "voluntary-cessation" exception does not apply to Plaintiffs' FLPMA-related claim for declaratory relief.

Nevertheless, Plaintiffs insist that the "voluntary-cessation" exception applies to their FLPMA-related claim for declaratory relief. "An exception to the mootness doctrine can occur when a defendant voluntarily ceases a challenged action. This exception traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1121 (10th Cir. 2009) (internal quotation and citations omitted); *Chihuahuan Grasslands All.*, 545 F.3d at 892 ("[T]his exception exists to counteract the possibility of a defendant ceasing illegal action long enough to render a lawsuit moot and then resuming the illegal conduct.").

"Voluntary actions may, nevertheless, moot litigation if two conditions are satisfied: '(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Rio Grande*, 601 F.3d at 1115 (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379 (1979)). In other words, "[v]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive

the court of jurisdiction." *Id.* (citation omitted). And "[t]he party asserting mootness bears the 'heavy burden of persuading' the court that the challenged conduct cannot reasonably be expected to start up again." *Id.* (internal alteration omitted).

Still, this "heavy burden" often falls more lightly on government actors.[8] *See id.* at 1116. In practice, the burden "has not prevented governmental officials from discontinuing challenged practices and mooting a case." *Id.* Thus, "withdrawal or alteration of administrative policies can moot an attack on those policies." *Id.* at 1117 (alteration and quotations omitted) (quoting *Bahnmiller v. Derwinski*, 923 F.2d 1085, 1089 (4th Cir. 1991)). "And the 'mere possibility' that an agency might rescind amendments to its actions or regulations does not enliven a moot controversy." *Id.* The Tenth Circuit's reasoning in *Rio Grande*, 601 F.3d at 1117–21, is illustrative of these principles.

    **a.** ***Rio Grande Silvery Minnow v. Bureau of Reclamation***

*Rio Grande* dealt specifically with an alleged violation of the Endangered Species Act ("ESA") by the Bureau of Reclamation. Environmental groups sought injunctive and declaratory relief based on the alleged failure of the Bureau to adequately consult with the Fish and Wildlife Service ("FWS") when determining the allocation of water flows from the Rio Grande. The environmental groups insisted that the allocation project entailed discretionary involvement or control by the Bureau, triggering the need for more extensive consultation under the ESA. They also claimed that the biological opinion ("BO") regarding the effect of the allocation on certain endangered aquatic species was deficient as a result of the allegedly inadequate consultation. The

---

[8] Certain circuits have explicitly adopted a more lenient approach to government actors in the voluntary-cessation context. *See, e.g., Sossamon v. Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Chi. United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 947 (7th Cir. 2006); *Troiano v. Supervisor of Elections in Palm Beach Cty.*, 382 F.3d 1276, 1283 (11th Cir. 2004); *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988). However, the Tenth Circuit has not "definitively opine[d] on what explicit measure—if any—of greater solicitude is due administrative agencies in the application of the voluntary-cessation exception." *Rio Grande*, 601 F.3d at 1117.

Bureau argued that it did not have sufficient discretion over the project to trigger a duty to consult with FWS under the ESA. During the course of litigation, the FWS issued several superseding BOs, culminating in a final BO that resulted from extensive consultation between the Bureau and FWS. While conceding that this new BO (along with the underlying consultation) mooted much of their claim, the environmental groups maintained that the Bureau's extensive consultation in this instance was a "voluntary cessation" of challenged conduct, and that the alleged failure to adequately consult was likely to recur.

The Tenth Circuit, noting that "withdrawal or alteration of administrative policies can moot an attack on those polices," refused to apply the "voluntary cessation" exception. *Id.* at 1117. The court first held that "there is no reasonable expectation that [the Bureau] will revert to using the same consulting process which resulted in the [challenged BOs]." *Id.* The court explained that there was no evidence that the new BO was a sham meant "merely to defeat the . . . court's jurisdiction." *Id.* at 1117–18. Further, the court reasoned that the newly issued and adopted BO had "established a new regulatory context for assessing the propriety of [the Bureau's] conduct under the ESA[,]" meaning that any future ESA issues would arise in a regulatory framework fundamentally different from the one that originally gave rise to the environmental groups' claim. *See id.* at 1118.

In dicta, the court also acknowledged that the Bureau had not abandoned its view that extensive consultation was not required—even openly contemplating reversion to that position in the new BO—but nevertheless concluded that the mere possibility of reversion to past practice "would not be sufficient to warrant application of the voluntary-cessation exception." *Id.* at 1119 (citing *Ala. Hosp. Ass'n v. Beasley*, 702 F.2d 955, 961 (11th Cir. 1983)). The court again reasoned that even if the challenged practice were "to arise again it would be in a different

regulatory context than that challenged by the [e]nvironmental [g]roups." *Id.* "Consequently, the precise issue that was the subject of the [e]nvironmental [g]roups' action is no longer extant, and it would not be reasonably likely to recur through [the Bureau's] actions." *Id.* (citing *Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1150, 1150 (10th Cir. 2007)).

Finally, the court held that "interim events ha[d] 'completely and irrevocably eradicated the effects of the alleged violation.'" *Id.* at 1120 (quoting *Cty. of Los Angeles*, 440 U.S. at 631)). The court could find "no lingering effects from the federal agencies' alleged violations of the ESA" in the previous BOs since they were no longer operative. *Id.* The court concluded that "the appropriate foundation for the application of the voluntary-cessation exception of the mootness doctrine" was lacking, and accordingly held the environmental groups' claim moot. *Id.* at 1121.

**b. Application of *Rio Grande* and *County of Los Angeles* to the facts of this case.**

The court finds the reasoning of *Rio Grande* applicable to the situation at hand and, as explained below, concludes that the voluntary cessation exception does not apply to Plaintiffs' FLPMA claim. Again, in order for its voluntary action to moot litigation, BLM must demonstrate that, first, "there is no reasonable expectation that the alleged violation will recur," and second that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Cty. of Los Angeles*, 440 U.S. at 631 (internal quotations, alterations, and citations omitted). Applying the framework of *Rio Grande*, the court holds that BLM has met each of the requirements articulated in *County of Los Angeles*.

First, BLM has satisfied this court that the specific FLPMA violations alleged by Plaintiffs cannot reasonably be expected to recur. As in *Rio Grande*, there is no evidence that the BLM's suspension of APDs was meant "merely to defeat the district court's jurisdiction" or to avoid adverse judgment. *See id.* at 1117 (citing *Chihuahuan Grasslands*, 545 F.3d at 893). The

Tenth Circuit has indicated that "government 'self-correction . . . provides a secure foundation for mootness so long as it seems genuine.'" *Brown v. Buhman*, 822 F.3d 1151, 1167–68 (10th Cir. 2016) (quoting *Rio Grande*, 601 F.3d at 1118) (ellipsis in original). And the decision here to fundamentally reevaluate the APDs in light of newly minted environmental impact analysis appears to be entirely corrective—a tacit acknowledgement of potential deficiency in the previous approval process. (*See* Docket No. 71-1) ("We have concluded that it is necessary to suspend the seven APDs . . . until the completion of an appropriate [NEPA] document analyzing . . . site-specific impacts of the APDs . . . ."). This "weakens the implication that [BLM] manipulated the system" to avoid judicial review. *See Rio Grande*, 601 F.3d at 1117; *Brown*, 822 F.3d at 1166 ("[The voluntary-cessation exception] is designed to prevent gamesmanship."); *Sossamon*, 560 F.3d at 325 ("We will not require some physical or logical impossibility that the challenged policy will be reenacted absent evidence that the voluntary cessation is a sham for continuing possibly unlawful conduct.").

More importantly, the suspension of the original APDs in favor of "*new* decision[s] covering each suspended APD," (Docket No. 71-1 (emphasis added)), provides a "new regulatory context" for assessing the need for additional air quality restrictions in the APDs (should they be reissued), *see Rio Grande*, 601 F.3d at 1118. Each APD will be reevaluated independently and ultimately rise or fall on the basis of a new environmental impacts analysis. (*See* Docket No. 71-1) (indicating that BLM will create a new NEPA document analyzing "among other things, the site-specific impacts of the APDs"). This analysis will undoubtedly include some site-specific air quality impact analysis or at least a reevaluation of existing data from other studies, as NEPA requires BLM to "consider *every* significant aspect of the environmental impact of a proposed action." *See Citizens' Comm.*, 297 F.3d at 1021 (internal

quotations omitted and emphasis added) (quoting *Balt. Gas*, 462 U.S. at 97); 42 U.S.C. §

4332(2)(C)(i)–(ii) (requiring analysis of "*any* adverse environmental effects which cannot be

avoided should the proposal be implemented" (emphasis added)). Ostensibly, any air quality

restrictions that BLM considers for the new APDs will be judged against this new analysis,

creating an entirely new framework for evaluation of BLM's compliance with the air quality

standards contained in the PFO ROD/RMP and therefore mandated by FLPMA. Thus, even if the

new APDs fail to include air quality provisions Plaintiffs believe are necessary for statutory

compliance, that issue would arise "in a different regulatory context than that [originally]

challenged by [Plaintiffs]." *See Rio Grande*, 601 F.3d at 1119. As a result, the "precise issue"

that Plaintiffs seek to adjudicate (i.e., the adequacy of air quality protections in the original

APDs) "is no longer extant" and will only recur in the context of an entirely new decisionmaking

process informed by an entirely new analysis of the risks posed to air quality by each APD. *See

id.* ("Consequently, the precise issue that was the subject of the [e]nvironmental [g]roups' action

is no longer extant, and it would not be reasonably likely to recur through [the Bureau's]

actions."); *Unified Sch. Dist. No. 259*, 491 F.3d at 1150 (explaining that "the 'voluntary

cessation' doctrine is inapplicable" where "future instances of wrongful behavior may be quite

different than the complained-of example that has already ceased" (internal quotations omitted)).

     Plaintiffs protest, and the court acknowledges, that BLM has expressly indicated that it

may re-issue the original APDs without any new restrictions or approval conditions—i.e.,

without the air quality restrictions that Plaintiffs insist are necessary to fully comply with the

PFO ROD/RMP and FLPMA. (*See* Docket No. 71-1 (explaining that, after environmental

impacts analysis, BLM may "lift the suspension without modifying the conditions of approval

specified in the prior approval")). However, the reservation of this option in BLM's amendment

to its previous decision does not suggest that BLM will certainly take that course, or even that it

is likely to do so. In fact, BLM listed the option as one among several: BLM may also add

entirely new conditions of approval, modify existing conditions of approval, or deny the APDs

altogether. (*See id.*). Thus, BLM *could* lift the suspension and leave the APDs as they were

originally, but that scenario is no more likely to occur than the outright termination of the APDs

or a fundamental alteration of their terms. Although there is certainly "*some* possibility" that

BLM will lift the suspension without any additional air quality restrictions or other

modifications, *see Rio Grande*, 601 F.3d at 1119, there is no evidence to suggest that option is

somehow favored or more likely to be selected. The theoretical possibility of reversion alone is

not "sufficient to warrant application of the voluntary-cessation exception" in this case.[9] *See id.*;

*id.* at 1117 ("A case ceases to be a live controversy if the possibility of recurrence of the

challenged conduct is only a speculative contingency." (internal quotations and alterations

omitted)); *Ala. Hosp. Ass'n*, 702 F.2d at 961 (explaining that the "mere possibility that the state

might rescind its recent amendment does not, for purpose of mootness, enliven the

controversy"); *Moore v. Thieret*, 862 F.2d 148, 150 (7th Cir. 1988) ("If the likelihood [of

recurrence] is small (it is never zero), the case is moot."). Therefore, the court holds that the

specific violations Plaintiffs allege cannot reasonably be expected to recur.

As for the second requirement under *County of Los Angeles*, BLM has satisfied this court

that "interim . . . events have completely and irrevocably eradicated the effects of the alleged

---

[9] Moreover, even if BLM actually decides to reissue the APDs unmodified and without the air quality restrictions Plaintiffs demand, that decision will arise from a new decsionmaking process informed by new and presumably thorough environmental impacts analysis. Thus, if the issue "does arise again it would be in a different regulatory context than that challenged by [Plaintiffs]." *See Rio Grande*, 601 F.3d at 1119. This will fundamentally alter the basis of Plaintiffs' claims and the framework in which the court assesses BLM's compliance with its own RMP and FLPMA. *See id.* at 1118–19 (explaining that the issuance of a new BO "established a new regulatory context for assessing the propriety of [the Bureau's] conduct under the ESA" and therefore it was unlikely that the issue at the heart of the environmental groups' claim would arise "in the same (or essentially the same) manner that gave rise to [their] challenge").

violation." 440 U.S. at 631 (citations and quotations omitted). Here, Plaintiffs allege that, "[a]s authorized, the Seven-Wells project allows construction, drilling, and other pollution-causing operations when ozone levels in the Uinta Basin are dangerously high and above NAAQS." (Docket No. 62, at 42). But now that all APDs for the Project have been indefinitely suspended, no "construction, drilling, [or] other pollution-causing operations" will occur. And there is no evidence of any other "lingering effects" resulting from BLM's alleged violations of the PFO ROD/RMP and FLPMA. *See Rio Grande*, 601 F.3d at 1120. Consequently, the court holds that any detrimental effect or injury that may have arisen from the alleged violations has been extinguished by the suspension.

Based on the foregoing, the court holds that Plaintiffs' claims regarding the Seven-Wells Project are moot, and the voluntary cessation exception does not apply to Plaintiffs' FLPMA-related claim for declaratory relief. As mootness vitiates this court's subject matter jurisdiction over these claims, *see Chihuahuan Grasslands*, 545 F.3d at 891, the court must dismiss them without prejudice, *see Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1249 (10th Cir. 2004) ("In cases where the district court has determined that it lacks jurisdiction, dismissal of a claim must be without prejudice.").

## CONCLUSION

In accordance with the above analysis, the court **ORDERS** that BLM's decision regarding the 2011 Lease Sale be **AFFIRMED.**

Additionally, Plaintiffs' claims under NEPA and FLPMA regarding the Seven-Wells Project are **DISMISSED** without prejudice.

Signed this 31st day of March, 2017.

BY THE COURT

Jill N. Parrish
United States District Court Judge